946 N.E.2d 1200 (2011)
George F. EVANS, Jr., Appellant-Petitioner,
v.
Peggy A. EVANS, Appellee-Respondent.
No. 12A02-1008-DR-895.
Court of Appeals of Indiana.
March 30, 2011.
*1202 Peter L. Obremskey, Timothy L. Karns, Parr Richey Obremskey Frandsen, & Patterson LLP, Lebanon, IN, Attorneys for Appellant.
James D. Moore, John D. Shoup, Ryan, Moore & Cook, Frankfort, IN, Attorneys for Appellee.

OPINION
BROWN, Judge.
George F. Evans, Jr. appeals the trial court's order granting a motion to compel payment in favor of James C. Michael, as personal representative of the estate of Peggy A. Evans, pursuant to an amended dissolution decree. George raises one issue which we revise and restate as whether the trial court abused its discretion by granting Michael's motion to compel payment after amending the dissolution decree pursuant to Ind. Trial Rule 60(B). We affirm.
The relevant facts follow. On March 7, 2007, the trial court entered its dissolution decree dissolving the marriage of George and Peggy and equally dividing the marital assets. Under the terms of the decree, each party was entitled to $371,930.00 and certain listed assets were set off to Peggy totaling $263,255.00. The decree also ordered the entry of a qualified domestic relations order ("QDRO") against George's Daimler Chrysler Corporation UAW pension plan in the amount of $108,675.00 to "adequately compensate [Peggy] for her 50% interest in the net marital assets of the parties." Appellant's Appendix at 16. The court determined that this amount should be paid over a ten year period in regular equal monthly installments, except for the final payment, and with an interest rate of 5 percent simple interest per annum. The court ordered George's attorney to prepare the QDRO. At the time the decree was entered, George had already begun receiving benefits from his pension plan.
After the entry of the decree, George's counsel, Rick Martin, began preparing the documents to implement the QDRO. On May 9, 2007, Peggy's counsel, Donald Bolinger, sent Martin a sample QDRO form used by George's employer. On June 21, 2007, Martin sent a draft of the QDRO to *1203 Bolinger for his approval. After Bolinger and the court approved the proposed QDRO, the QDRO was submitted to George's pension plan administrator, Benefit Express. On August 14, 2007, Benefit Express advised the parties that the proposed QDRO had been denied because it did not comply with Section 414(p) of the Internal Revenue Code and Section 206(d)(3) of the Employee Retirement Income Securities Act ("ERISA").
On December 17, 2007, Peggy filed a motion requesting a hearing concerning the QDRO's distribution in light of the August 14, 2007 denial notice. The court set a hearing on Peggy's motion for February 1, 2008, which was continued until March 5, 2008.[1] On July 11, 2008, Bolinger, at the direction of the court, prepared an amended QDRO which was again approved by the court. On August 22, 2008, however, Benefit Express again denied the QDRO. After some investigation, Bolinger advised Martin that the problem with the amended QDRO was that the plan's benefits to Peggy must terminate upon her death.
On June 8, 2009, Peggy filed a motion for proceedings supplemental. She died on August 17, 2009. Because a QDRO had not been entered against George's pension plan, Peggy had not received a single payment toward her fifty percent share of the net marital assets. On November 5, 2009, Peggy's Estate filed its motion for substitution of party asking that Michael, as duly appointed personal representative of Peggy's estate, be substituted as a party in the dissolution proceedings. Also on November 5, 2009, Michael filed a motion to compel payment praying "that the Court order the preparation of a QDRO consistent with the terms of the Decree, or alternatively, enter an order for payment of [$108,675.00] plus interest at the rate of five percent . . ." by George to Peggy's estate. Id. at 19. On November 9, 2009, the court granted the motion for substitution of party.
The court originally set a hearing date of November 30, 2009. However, that hearing date was eventually vacated. On January 13, 2010, George filed an objection to motion to compel payment. On March 3, 2010, Michael filed a response to George's objection. On March 22, 2010, George filed his surreply in support of his objection to motion to compel payment, and on May 27, 2010, Michael filed a response to George's surreply in support and alternatively requested relief under Ind. Trial Rule 60(B)(8).
On May 27, 2010, the court entered an order granting the motion to compel payment. Characterizing the motion to compel payment as a motion for relief from judgment pursuant to Ind. Trial Rule 60(B)(8), the court concluded that the QDRO requirement should be eliminated and a payment plan should be instituted, stating that the "[d]ecree, as written, does not comply with either ERISA or [George's] pension plan. As a result, the Court's Decree is legally impossible to implement." Id. at 68.
On June 28, 2010, George filed a motion to correct error, arguing that the trial court incorrectly applied Ind. Trial Rule 60(B) to modify the decree. On July 14, 2010, the court denied George's motion.
The issue is whether the trial court abused its discretion by granting Michael's motion to compel payment after amending the dissolution decree pursuant to Ind. Trial Rule 60(B). George appeals from *1204 the trial court's denial of his motion to correct error which we review for an abuse of discretion. Hawkins v. Cannon, 826 N.E.2d 658, 661 (Ind.Ct.App.2005), trans. denied. An abuse of discretion occurs when the court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. Id.
We address whether the court abused its discretion when it (A) treated Michael's motion to compel immediate payment of Peggy's share of the value of the marital estate as a motion for relief from judgment under Ind. Trial Rule 60(B)(8); and (B) ordered the development of an alternate payment plan, separately.

A. Treatment of Michael's Motion Under Ind. Trial Rule 60(B)(8)

George contends that the trial court abused its discretion when it characterized Michael's motion to compel immediate payment of Peggy's share of the value of the marital estate as a motion for relief from judgment under Ind. Trial Rule 60(B). Specifically, he asserts that the trial court abused its discretion by utilizing Ind. Trial Rule 60(B) to rectify a legal mistake because Indiana case law prohibits the use of the rule as a vehicle to correct legal errors. Alternatively, within the confines of Ind. Trial Rule 60(B), George argues that even if T.R. 60(B) is applicable to the instant case, relief under "subdivision (8) is not available if the grounds for relief properly belong in another of the enumerated subdivisions of 60(B)," and that this matter is more properly analyzed under subsection (1) governing legal mistake. Appellant's Brief at 14 (quoting In re Marriage of Jones, 180 Ind.App. 496, 498-499, 389 N.E.2d 338, 340 (1979)). Thus, George argues that "a motion for relief falling within the scope of subdivision (B)(1) of this rule may not be filed under subdivision (B)(8) . . . to obtain the `reasonable time' advantage of the latter motion." Id. Finally, George argues that even if the court had the authority to modify the dissolution decree under Ind. Trial Rule 60(B)(8), the record does not contain evidence demonstrating that Michael's motion was filed within a reasonable time or presented a meritorious claim.
Initially, we acknowledge the well-known legal premise that "[a]fter entering an agreed judgment, the trial court has no authority to modify or change the judgment in any essential or material manner." Mitchell v. Stevenson, 677 N.E.2d 551, 565 (Ind.Ct.App.1997), trans. denied. Strong policy favors the finality of marital property divisions, whether a court approves the terms of a settlement agreement reached by parties or the trial court divides the property. See Dusenberry v. Dusenberry, 625 N.E.2d 458, 461 (Ind.Ct. App.1993). However, a dissolution court may exercise continuing jurisdiction to reexamine a property settlement where the nature of which is to seek clarification of a prior order. Fackler v. Powell, 839 N.E.2d 165, 167 (Ind.2005). This jurisdictional grant to a dissolution court is warranted as an extension of the court's necessary and usual powers to effectuate the marital dissolution, which includes the power to interpret the court's own decree. Id.
In Case v. Case, the value of the husband's 401(k) plan decreased significantly, and therefore, the trial court amended the dissolution decree and resulting QDRO because the original decree contemplated that both parties would share in the risks and rewards associated with the 401(k) plan. 794 N.E.2d 514, 518 (Ind.Ct.App. 2003). We held: "[T]he trial court did not modify the original decree as much as the court clarified the decree to reflect its original meaning." Id. at 519. Also, in *1205 Parham v. Parham, relied upon by the trial court in its order, the court entered a divorce decree granting wife a QDRO. 855 N.E.2d 722, 725 (Ind.Ct.App.2007), trans. denied. After the proposed QDRO was twice rejected by husband's pension plan administrator, wife filed a motion requesting the trial court to amend the terms of the QDRO. Id. The court revised the terms of the QDRO in accordance with husband's pension plan. Id. at 725-726. Husband filed a motion to correct error. Id. at 726. On appeal, we affirmed the trial court, noting that the amendment of the QDRO was appropriate because wife requested relief from a judgment that was impossible to implement. Id. at 727.
Likewise, here Michael requested relief from a judgment that is legally impossible to implement. In particular, the trial court granted Peggy half of the net marital estate by way of a QDRO. Benefit Express rejected the proposed QDRO twice because it violated ERISA and the terms of George's pension plan. As such, the trial court, modifying its original QDRO by devising an alternate payment plan, exercised its inherent power to make such orders as were necessary to enforce its prior decree. Thus, rather than being an alteration of the dissolution decree and awarding Peggy a greater or smaller part of the marital estate, the court's order is a clarification to provide Peggy with the marital property she was entitled to receive under the original decree. See Bitner v. Hull, 695 N.E.2d 181, 183 (Ind.Ct. App.1998) (noting that "[c]ourts of this State have long had power, both inherent and statutory, to entertain actions to determine whether a judgment has been carried out and satisfied" and that "[r]ather than being an alteration of the dissolution decree, Wife's petition was merely an enforcement mechanism . . .").
Turning to George's arguments, Ind. Trial Rule 60(B) provides in part:
On motion and upon such terms as are just the court may relieve a party or his legal representative from a judgment, including a judgment by default, for the following reasons:
(1) mistake, surprise, or excusable neglect;
* * * * * *
(8) any reason justifying relief from the operation of the judgment, other than those reasons set forth in sub-paragraphs (1), (2), (3), and (4).
The motion shall be filed within a reasonable time for reasons (5), (6), (7), and (8), and not more than one year after the judgment, order or proceeding was entered or taken for reasons (1), (2), (3), and (4). A movant filing a motion for reasons (1), (2), (3), (4), and (8) must allege a meritorious claim or defense.
Relief under Trial Rule 60(B) may be granted only upon motion by a party. Joachim v. Joachim, 450 N.E.2d 121, 122 (Ind.Ct.App.1983). But a trial court may look beyond the form of a motion to its substance. Hubbard v. Hubbard, 690 N.E.2d 1219, 1221 (Ind.Ct.App. 1998). Moreover, we have frequently held that where the purpose of a rule is satisfied, this court will not elevate form over substance. Parham, 855 N.E.2d at 727.
Although Michael did not expressly designate his motion as one pursuant to Trial Rule 60(B), instead qualifying it as a motion to compel, the court in its order characterized the motion as a motion for relief pursuant to T.R. 60(B)(8). This court in Case addressed the grant of relief under T.R. 60(B)(8) in the context of a dissolution decree where the trial court granted relief under T.R. Rule 60(B)(8) and amended the QDRO after the value of husband's 401(k) plan diminished significantly. 794 N.E.2d *1206 at 517-518. A similar result was reached in Parham where the trial court granted relief under T.R. 60(B)(8) to amend a QDRO which violated ERISA and was incompatible with husband's pension plan. 855 N.E.2d at 728.
Here, the dissolution decree ordered Martin, George's counsel, to prepare a QDRO which included terms that failed to comply with either ERISA or George's pension plan. Thus, like the decrees in Case and Parham, this part of the dissolution decree cannot be implemented. As a result, the court offered relief from its initial QDRO pursuant to Trial Rule 60(B)(8) and ordered that the parties agree to an alternate payment plan or that the court would make such a determination. On these facts, we conclude that Michael's motion was properly recast by the trial court as a T.R. 60(B)(8) motion.
With respect to the timeliness of Michael's motion, we note that to fall within the confines of T.R. 60(B)(8), Michael must have filed his motion "within a reasonable time." Determining what is a reasonable time period depends on the circumstances of each case, as well as the potential prejudice to the party opposing the motion and the basis for the moving party's delay. Id.
In the case before us, the trial court entered its dissolution decree on March 7, 2007. Approximately two months later, attorneys for both parties commenced drafting the proposed QDRO. The QDRO was denied by Benefit Express on August 14, 2007. Four months later, Peggy filed a motion requesting a hearing to discuss the August 14, 2007 denial notice, which the court scheduled for March 5, 2008. On July 11, 2008, Bolinger prepared an amended QDRO, which was again denied on August 22, 2008. After the second denial, Bolinger investigated the terms of the QDRO and advised Martin that the QDRO cannot continue for a specific period of time as envisioned by the court, but must terminate on the event of Peggy's death. On June 8, 2009, Peggy filed a motion for proceedings supplemental; she died on August 17, 2009. On November 5, 2009, Peggy's estate demanded payment of Peggy's share of the net marital estate. In all, the proceedings spanned approximately two-and-a-half years. Although counsel for both parties could have been more diligent in their pursuit of an enforceable QDRO, we cannot say that the time to wade through ERISA and the complications of a pension plan was unreasonable in this case.
Turning to Ind. Trial Rule 60(B)(8)'s requirement of a meritorious claim or defense, we have previously held that a meritorious defense is established when "if the case [were] retried on the merits, a different result would be reached." Id. at 729. In ruling on a T.R. 60(B) motion, the trial court must balance the alleged injustice suffered by the party moving for relief against the interests of the winning party and societal interest in the finality of litigation. Id.
A QDRO must comply with ERISA. See 29 U.S.C. §§ 1001-1461. Under ERISA, pension benefits may be assigned or alienated from the plan participant only if the order alienating the benefit is a QDRO. See 29 U.S.C. § 1056(d)(3). But a QDRO cannot require the plan administrator to provide any type or form of benefit, or any option, not otherwise provided under the plan. See 29 U.S.C. § 1056(d)(3)(D)(i).
In sum, the QDRO was impossible to implement under the terms ordered by the trial court. A trial court with knowledge of a pension plan's requirements would not order the preparation of a QDRO that does not comply with ERISA. See Parham, *1207 855 N.E.2d at 730. Thus, if the case were retried on the merits a different result would be reached. Accordingly, we conclude that Michael has presented a meritorious claim.

B. Alternate Payment Plan

An issue raised by the dissent is that the proposed QDRO included in the dissolution decree accounted for the shared "risks and rewards associated with pension benefits," including the death of either party, and that therefore the court erred in ordering the development of an alternate payment plan to pay Peggy's estate $108,675.00. Op. at 1208 (Riley, J., concurring in part and dissenting in part). Instead, the dissent believes that the "appropriate amount" Peggy is entitled to is the amount Peggy would have received through the QDRO from March 7, 2007, until her death on August 17, 2009. Id. For the following reasons, we disagree.
In the dissolution decree, the trial court noted "that a 50/50 division of the net marital assets is appropriate under the circumstances." Appellant's Appendix at 16. The court found the parties' total assets minus liabilities to be $743,860.00 and determined that each party was therefore entitled to $371,930.00. Assets of $263,255.00 had already been set aside to Peggy as part of the dissolution decree. In determining how to balance the Evans' marital assets and award Peggy the remaining $108,675.00, the court could have utilized a number of avenues and chose to make an award through a QDRO from George's pension plan which was to last for a period of ten years. See, e.g., Everette v. Everette, 841 N.E.2d 210, 214, 214 n. 11 (Ind.Ct.App.2006) (noting that, although the court exceeded its authority in issuing a QDRO for husband's Public Employees' Retirement Fund account, it did "not leave the trial court without recourse to evenly divide the marital estate," and suggesting that a distribution to wife "of an equalizing amount of the proceeds from the sale of the [parties'] time-share condominium could be an appropriate mechanism to balance the distribution . . ."). It was later that the court learned its order did not comply with ERISA because the plan cannot continue for a specific period of time and must terminate upon Peggy's death.
At the time of Peggy's death, a valid QDRO for George's pension had not been accepted, and a legal path to equalizing the marital pot had not yet been determined. As explained above, the court maintained jurisdiction over this matter in order to give effect to its prior-issued dissolution decree. Especially in light of the fact that the QDRO had not been accepted, we look to the terms of the dissolution decree which expressed the court's intent to award Peggy a sum certain plus interest over a ten-year period and that "payment to her in that amount over time will adequately compensate [Peggy] for her 50% interest in the net marital assets of the parties."[2] Appellant's Appendix at 16. Accordingly, we conclude that the court did not err when it ordered the development of an alternate payment plan for the $108,675.00 owed by George to Peggy's estate. See Parham, 855 N.E.2d at 730-731 (holding that the dissolution decree required a QDRO that was impossible to accomplish and that the court's modification pursuant to Trial Rule 60(B)(8) did not alter the terms of the original decree, *1208 and noting that "the trial court had a nondelegable duty to divide the property" and that "[w]ife's motion to submit a revised QDRO informed the court that the part of the decree distributing the pension was for all intents and purposes a nullity and, as a result, that the trial court had not completely divided the parties' property. Thus, the trial court had an affirmative duty to amend the decree . . .").
For the foregoing reasons, we affirm the trial court's grant of Michael's motion to compel payment.
Affirmed.
ROBB, C.J., concurs.
RILEY, J., concurs in part and dissents in part with separate opinion.
RILEY, Judge, concurring in part and dissenting in part with separate opinion.
While I agree with the majority's treatment of the trial court's characterization of Michael's motion to compel as a motion within the confines of Indiana Trial Rule 60(B)(8), I respectfully disagree with its analysis of the trial court's alternate payment plan.
The evidence reflects that in its decree, the trial court awarded Peggy an equal share of the net marital estate. In order to effectuate this division, the trial court constructed a QDRO, which stipulated that George should pay Peggy $108,675.00 over a ten year period in equal monthly installments, with an interest rate of 5% per annum. At the time of the trial court's decree, March 7, 2007, George had started receiving pension benefits under his plan. Despite repeated efforts, no QDRO had been constructed by the time of Peggy's death on August 17, 2009.
It is clear that at her death, Peggy's estate contained her right to half of the net marital estate. At the same time, it is undeniable that, absent express language in the QDRO, the parties share in the risks and rewards associated with pension benefits. One of those risks is the death of either party. In the proposed QDRO before us, the terms expressly include that at the death of the alternate payee (here, Peggy) payouts under the plan would cease and Peggy's portion of George's benefits would revert back to George. Peggy did not object to the inclusion of this clause. In other words, even though Peggy has an interest in fifty percent of the net marital estate, this interest is limited by the provisions of the QDRO, most notably by the prohibition to continue receiving payouts from George's pension plan after her death into her estate even if her share of the net marital property is not yet completely transferred.
Thus, in the event a QDRO had been executed after the trial court entered its decree on March 7, 2007, Peggy's payments would have ceased on August 17, 2009, the date of her death. Therefore, I find that the trial court erred by awarding the estate an alternate payment schedule for the total $108,675.00. I would reverse and remand to the trial court with instructions to calculate the appropriate amount Peggy would have received through the QDRO from March 7, 2007 until August 17, 2009.
NOTES
[1] The chronological case summary is silent as to whether the March 5, 2008 hearing ever occurred or was rescheduled.
[2] Indeed, the dissolution decree makes no mention of the parties sharing in the risks and rewards associated with pension benefits. Also, the fact that the original dissolution decree provided for a stop date for Peggy to receive pension benefits after ten years demonstrates that the parties did not agree to equally share the risks and rewards associated with the pension.