## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 16 2016, 10:43 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Jay Lauer | Rachel E. Doty |
| South Bend, Indiana | Craig V. Braje |
| | Braje, Nelson, and Janes LLP |
| | Michigan City, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

In Re The Marriage Of:

Cheryl Ann Hester,

*Appellant-Petitioner,*

v.

Michael D. Hester, Jr.,

*Appellee-Respondent.*

February 16, 2016

Court of Appeals Case No. 46A05-1505-DR-309

Appeal from the LaPorte Superior Court

The Honorable Michael S. Bergerson, Judge

Trial Court Cause No. 46D01-1010-DR-171

**Brown, Judge.**

[1] Cheryl Ann Hester ("Wife") appeals from the trial court's order granting the motion for relief from judgment of Michael D. Hester, Jr., ("Husband") related to the division of his retirement savings. Wife raises two issues which we revise and restate as:

> I. Whether the court abused its discretion or erred in granting Husband's motion; and
>
> II. Whether the court abused its discretion in ordering her to pay attorney fees.

In addition, Husband requests appellate attorney fees. We affirm and deny Husband's request for appellate attorney fees.

### Facts and Procedural History

[2] On October 21, 2010, Wife filed a petition for dissolution of marriage. On October 5, 2012, the trial court entered a summary dissolution decree providing in part that the court approved the Property Settlement Agreement (the "PSA") Husband and Wife had executed on that date. Under the heading "401K & PENSION," the PSA stated that "Wife shall participate in Husband's Con-Way Pension and Conway Retirement Savings Plan as specified in the attached Qualified Domestic Relations Order (Exhibit A)." Appellant's Appendix at 3. The PSA also provided that "[n]o modification or waiver of any of the terms of this Agreement shall be valid unless in writing and executed by both parties hereto." *Id.* at 4.

[3]    A Qualified Domestic Relations Order ("QDRO") signed by Wife and Husband as of October 5, 2012, was filed on October 5, 2012 (the "October 5, 2012 QDRO"). Under a heading for plan name and administrator, this QDRO identified the name of the plans to which the order applied as the Con-Way Pension Plan and the Con-Way Retirement Savings Plan, the administrator as the Administrative Committee, and the plan sponsor as Con-Way Enterprises Services, and it provided an address in Portland, Oregon. Under the heading for "Division of Tax Qualified Defined Contribution and Defined Benefit Plans," the QDRO provided:

> 4.    Amount of [Wife's] Benefit: This Order assigns to [Wife] as her sole and separate property the following amounts from the following Plans:
>
> > A.    <u>Con-Way Pension Plan</u>
> >
> > Six Hundred Dollars ($600.00) per month for 32 months. . . .
> >
> > * * * * *
> >
> > B.    <u>Con-Way Retirement Savings Plan</u>
> >
> > Thirty Four Thousand Dollars ($34,000.00). This amount is not subject to accruals and losses prior to the date of division. The date of division shall be as soon as administratively feasible following the date this Order is approved as a QDRO by the Plan, signed by all parties and the Court, and delivered to the Plan Administrator. Thereafter, [Wife's] payment shall not be subject to accruals but shall be reduced at the time of distribution if the value of [Husband's] account drops below Sixty Eight Thousand Dollars ($68,000.00). In the event of a loss in value of [Husband's] account, fifty percent

(50%) of the losses shall be deducted from the $34,000.00 transferred to [Wife] by this Order. Loss shall be determined by subtracting [Husband's] account balance at the time of distribution from Sixty Eight Thousand Dollars ($68,000.00).

The remaining balances of [Husband's] accounts are confirmed to [Husband] as [Husband's] sole ad [sic] separate property, subject to the terms and restrictions of the Plans. Any subsequent contributions made by or on behalf of [Husband] shall be credited to [Husband's] sole account. [Wife's] share shall be maintained for the benefit of [Wife] in accordance with the terms and restrictions of this Order and the Plans.

Unless [Wife] elects an immediate distribution that is permitted by the Plans at the time this Order is submitted to, and approved by the Plan, such benefits shall also be segregated and separately maintained in nonforfeitable accounts established on behalf of [Wife]. [Wife] shall thereafter be entitled to self-direct the investments in [Wife's] accounts subject to the terms and restrictions of the Plans.

*Id.* at 9-10.

[4] The October 5, 2012 QDRO was sent to the Con-Way retirement plan administrator, and senior retirement plan administrator Jack Cosgrove determined that it did not qualify as a qualified domestic relations order, in part because Con-Way had two separate retirement plans with different plan documents and a separate order was needed for each of the two plans. Cosgrove sent an email message to Wife and counsel for Husband stating that the QDRO did not qualify because separate orders were needed for the pension and the 401(k) plans, the pension portion was missing the appropriate death

provisions, the pension order was not defined as a separate interest order, the plan administrator was not defined as the administrative committee, and that the terms of the payment for Wife conflicted with plan provisions, as the payment would need to be in the form of a monthly annuity payment for the lifetime of Wife based on Husband's age sixty-five accrued benefit in the plan. Cosgrove also sent Wife and counsel for Husband procedures for preparing the orders.

[5] A few months later, Cosgrove received a draft pension order from counsel for Wife. Cosgrove sent a letter dated January 18, 2014, to Wife's counsel stating that the submitted QDRO related to Husband's pension plan benefit would qualify as a qualified domestic relations order,[1] and on January 22, 2014, the court approved the QDRO related to Husband's pension plan. On March 18, 2014, Cosgrove sent an email message to Wife's counsel asking whether a 401(k) order had been sent to QDRO Consultants in Medina, Ohio. Cosgrove's message further stated that 401(k) procedures and a model order were attached and that his office processed the pension order only.

[6] In June 2014, counsel for Wife filed a document with the trial court which stated:

> The decision of the court should be summarized as follows in the Chronological Case Summary under this cause number.

---

[1] Cosgrove testified that the pension QDRO complied with the plan documents and IRS rules, and applied to Husband's pension plan and not to Husband's 401(k) plan.

> Petitioner by counsel, Attorney Barbara S. Friedman files
> Supplemental Judgment Qualified Domestic Relations
> Order Con-Way Retirement Savings Plan. This document
> has been tentatively approved by the Con-way
> Administrator pending the Judge's approval. A previous
> QDRO has been approved for the pension plan this
> QDRO covers the Retirement Savings Plan.

*Id.* at 23.

[7] On June 6, 2014, Wife filed a Supplemental Judgment Qualified Domestic Relations Order Con-Way Retirement Savings Plan (the "Supplemental QDRO") with the court, and the court approved the order that day. The Supplemental QDRO stated that the matter came before the court "on the stipulation of the parties," but it was not signed by Wife or Husband. *Id.* at 24. It identified the plan to which the order applied as the Con-Way Retirement Savings Plan, the plan administrator as Con-Way Enterprises Services, and the plan administrator's agent as QDRO Consultants Co. with an address in Medina, Ohio. The Supplemental QDRO provided:

> 7. Amount of [Wife's] Benefit (Percentage Basis):
>
> This Order assigns to [Wife] an amount equal to fifty percent (50%) of [Husband's] account balance accumulated under the Plan as of October 21, 2010 (or the closest valuation date thereto), plus any interest/investment earnings or losses attributed thereon for periods subsequent to October 21, 2010, until the date of segregation of funds into separate account.
>
> The account balance will exclude the value of any outstanding loans as [of] the valuation date.
>
> It is understood that once [Wife's] share of the benefits are segregated and separately maintained in an account established

> on [Wife's] behalf pending distribution, they shall additionally [be] credited with any interest and investment income or losses from the date of segregation until the date of distribution to [Wife].
>
> [Wife's] share of the benefits shall be allocated on a "pro-rate" basis among all of the accounts and/or investment funds maintained on behalf of [Husband] under the Plan.

*Id.* at 26.

[8] Sara Baumgartner, who worked for QDRO Consultants, sent a letter dated July 17, 2014, to counsel for Wife which stated that Con-Way utilizes the services of QDRO Consultants for the review and administration of their retirement plans and that it had completed its review of the Supplemental QDRO. The letter stated that the Supplemental QDRO qualified as a QDRO under applicable federal pension law and that, under the terms of the QDRO, Wife would be entitled to fifty percent of Husband's total account balance in the plan as of October 21, 2010, along with any investment gains and losses attributable to her assigned share of the benefits for periods subsequent to October 21, 2010, until the date of total distribution. The letter indicated that copies of the letter "(w/waiver)" were sent to Husband and Wife. *Id.* at 31.

[9] On July 23, 2014, Husband signed a copy of a form titled "Waiver of QDRO Appeal Period." *Id.* at 32. The form stated "I, [Husband], hereby acknowledge receipt of notification that QDRO Consultants . . . has received a Domestic Relations Order ("Order") which it has determined to be a 'Qualified Domestic Relations Order'" and "I hereby waive my right to appeal QDRO Consultants'

determination that the Order is a QDRO, and request the Plan Administrator to process the QDRO as soon as administratively feasible."[2] *Id.* Husband later received an account statement for his Con-Way retirement savings plan showing a withdrawal in the amount of $55,316.74.[3]

[10]     On December 18, 2014, Husband filed a motion for relief from judgment alleging that the parties were divorced on October 5, 2012, and that, pursuant to the decree of dissolution, the October 5, 2012 QDRO was executed and approved by the court. He alleged that, without his knowledge, on June 6, 2014, Wife filed the Supplemental QDRO, that while the Supplemental QDRO stated it was done pursuant to stipulation he did not so stipulate and his signature is not on the face of the document, and that pursuant to the Supplemental QDRO Wife withdrew $55,316.74 from his retirement savings plan in contravention of the terms of the decree of dissolution.

[11]     On April 7, 2015, the court held a hearing on Husband's motion at which Husband testified in part:

> When I was . . . contacted by QDRO they asked me if I agreed to the terms. And I had agreed to the terms of – I even spoke with Sara Baumgartner, that I told her, yes, I agreed with the 34,000 and that's the reason I faxed it back in. I just signed it and faxed it. She said if I didn't have any disagreement. I didn't know

---

[2] The waiver form did not specifically identify the Supplemental QDRO.

[3] The page of the account statement admitted into evidence was for the period of July 8 to October 3, 2014.

about the, the stipulation you put in in June, so I agreed to the Divorce Decree, I agreed to the 34,000. . . .

They, they were going to settle, because of my account was locked. And I was contacted by them so we could get this finished. And I had – and she said if I didn't disagree with anything to just fax it back in. I didn't have any disagreements with the 34,000. I didn't know about the 55 --.

Transcript at 68-69.

[12] The court stated that the parties agreed to divide certain property on a given date and value it as of a given date and the fact that the PSA was approved by the parties "and negotiated in good faith and a flat number was indicated as to what the benefit was going to be to [Wife] to me indicates that there was . . . some clarity. It was clear, it was unambiguous. Not subject to approval of the plan." *Id.* at 72. The court noted that it had trouble with the changes in the Supplemental QDRO as Husband did not sign it and "[i]t was unilaterally done." *Id.* at 74. Wife's counsel stated that there was a modified agreement "accepted and signed by this Court," and the court responded "but not by this client . . . this participant." *Id.* at 75. The court noted that it sees documents submitted by attorneys day in and day out, the court relies upon attorneys and when an attorney says there is a stipulation the attorney is representing as an officer of the court that there is an agreement between the parties, and that Husband had testified there was no agreement and he was unaware of it. Husband's counsel argued that the technical aspects that Wife's counsel fixed in the Supplemental QDRO were fine but that she "just decided for one reason or

another to [] change the bargain[ed] for agreement from 34 flat to a percentage as of a certain date, plus or minus gains or losses." *Id.* at 81.

[13] The court later referenced the phrases of the Supplemental QDRO that Wife would receive fifty percent of the account balance in Husband's retirement savings plan "plus any interest/investment earnings or losses attributed thereon for periods subsequent to October 21, 2010, until the date of segregation of funds into separate account" and asked "[t]hat's a little bit different than what was negotiated in the [PSA], isn't it," and Wife's counsel answered "Yes." *Id.* at 84. The court noted the parties had an agreement that was approved by their respective counsel and the court and that the language of the October 5, 2012 QDRO stated "$34,000.00. This amount is not subject to accruals and losses prior to the date of division," and Wife's counsel stated "I understand that, yes." *Id.* at 85. The court stated "there's no ambiguity there," and Wife's counsel stated "[n]o, there is not." *Id.* at 85-86. The court continued "I can't say that I could read something else into that. It would mean that 34,000 is 34,000. No matter what day you look at it," and Wife's counsel stated "You are correct in that, Your Honor" but argued that the "director of the plan said as written in total . . . the pension plan was in error." *Id.* at 86. The court stated "[b]ut not as terms of that provision," and Wife's counsel replied "[h]e said in total" and "[t]here was so many reasons it was in error." *Id.*

[14] On April 8, 2015, the trial court entered findings of fact and conclusions of law, and found that the terms of the PSA dated October 5, 2012, including the attached proposed October 5, 2012 QDRO awarding $34,000 to Wife "are clear

and unambiguous and were understood by both parties when signed and incorporated into the Final Decree of Dissolution." Appellant's Appendix at 49. The court noted that a property settlement agreement incorporated into a final decree and order may not be modified unless the agreement so provides or the parties subsequently consent, and that the dissolution court may not modify a settlement incorporated into a divorce decree absent fraud, duress, or undue influence. The court concluded in part:

7. That [Husband] did not knowingly waive his objection to the modification of the PSA.

8. That [Husband] did not consent to a modification of the PSA.

* * * * *

10. Clearly, the agreement of the parties provides that [Wife] was awarded the sum of $34,000.00 from the Retirement Savings Plan; which amount was not subject to accrual.

11. That the terms of the PSA and the [October 5, 2012] QDRO are not ambiguous and not in need of any clarification and, absent fraud, the Court has no authority to modify the terms of the PSA negotiated by the parties and incorporated into the Decree.

12. That on June 6, 2014, without excuse or justification, [Wife] deliberately filed a supplemental QDRO to the Court for approval indicating that same was being filed pursuant to a stipulation between the parties when no such agreement existed.

13. That distribution was made from [Husband's] retirement savings plan in the amount of $55,316.74 to [Wife], pursuant to the June 6, 2014 Order.

*Id.* at 50-51 (footnote omitted). The court granted Husband's petition for relief from judgment and ordered that Wife pay Husband the sum of $21,316.74. The court also found that Husband was required to obtain the services of an attorney to represent him in the prosecution of the motion and hearing and that the legal services provided by his counsel were fair and reasonable, and it awarded attorney fees of $1,250 to Husband.

## *Discussion*

### I.

[15] The first issue is whether the trial court abused its discretion in granting Husband's motion for relief from judgment. A grant of equitable relief under Ind. Trial Rule 60 is within the discretion of the trial court. *Wagler v. West Boggs Sewer Dist., Inc.*, 980 N.E.2d 363, 371 (Ind. Ct. App. 2012), *reh'g denied*, *trans. denied*, *cert. denied*, 134 S. Ct. 952 (2014). An abuse of discretion occurs when the trial court's judgment is clearly against the logic and effect of the facts and inferences supporting the judgment for relief. *Id.* When reviewing the trial court's determination, we will not reweigh the evidence. *Id.* Ind. Trial Rule 60(B) affords relief in extraordinary circumstances which are not the result of any fault or negligence on the part of the movant. *Id.* at 371-372.

[16] Ind. Trial Rule 60(B) provides in part that the court may relieve a party "from a judgment for the following reasons: (1) mistake, surprise, or excusable neglect; . . . (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; . . . (6) the

judgment is void; [or] (8) any reason justifying relief from the operation of the judgment, other than those reasons set forth in sub-paragraphs (1), (2), (3), and (4)" and that a movant filing a motion for reasons (1), (3), and (8) above must allege a meritorious claim or defense.

[17] Wife states that the Supplemental QDRO referenced the stipulation of the parties but that the stipulation was based on Husband signing the waiver form. She asserts that the real issue in this case is whether she was entitled to the appreciation of the $34,000 from October 2012, when the total value appeared to be $68,000, until its distribution, and that it would be unjust and unreasonable to permit Husband to retain her appreciation for a period of almost two years.[4] She also argues that, since she did not receive an immediate distribution of her share, her benefits should have been segregated into a nonforfeitable account.

[18] Husband maintains that he did not consent or stipulate to the terms of the Supplemental QDRO, and that Wife did not dispute at the hearing that he did not sign or receive notice of the filing of the Supplemental QDRO prior to its *ex parte* submission to the court. He notes that Wife's counsel filed the

---

[4] Wife asserts that she is entitled to the growth in the account since October 2012. However, the Supplemental QDRO prepared by her counsel provided that Wife would receive fifty percent of the account balance "accumulated under the Plan as of *October 21, 2010* . . . plus any interest/investment earnings or losses attributed thereon for periods subsequent to *October 21, 2010* . . . ." Appellant's Appendix at 26 (emphases added). Baumgartner's letter to Wife's counsel stated that, under the Supplemental QDRO, Wife would be entitled to fifty percent of the balance in the plan as of October 21, 2010. The date of October 21, 2010, is the date Wife filed her petition for dissolution of marriage, and the October 5, 2012 QDRO did not reference this date, in setting forth Wife's share of Husband's retirement savings plan.

Supplemental QDRO on June 6, 2014, that he did not sign the waiver of the appeal period until July 23, 2014, and thus that the waiver did not validate the actions of Wife's counsel on June 6, 2014. He contends that the PSA and October 5, 2012 QDRO were unambiguous in providing Wife with the fixed sum of $34,000 which was not subject to any accruals, that Wife's counsel agreed with this interpretation, and that Wife's counsel simply did not feel the original award was in the best interests of her client and therefore seized an opportunity to unilaterally modify it.

[19] Ind. Code § 31-15-2-17(c) provides: "The disposition of property settled by an agreement described in subsection (a) and incorporated and merged into the decree is not subject to subsequent modification by the court, except as the agreement prescribes or the parties subsequently consent." Ind. Code § 31-15-7-9.1(a) provides: "The orders concerning property disposition entered under this chapter . . . may not be revoked or modified, except in case of fraud." Accordingly, absent fraud or the subsequent consent of the parties, a court lacks authority to modify a property settlement agreement or a property division order. *Pherson v. Lund*, 997 N.E.2d 367, 369 (Ind. Ct. App. 2013) (citing *Ryan v. Ryan*, 972 N.E.2d 359, 363 (Ind. 2012)).

[20] When dissolving a marriage, the parties are free to draft their own settlement agreement. *White v. White*, 819 N.E.2d 68, 70 (Ind. Ct. App. 2004). Such agreements are contractual in nature and become binding upon the parties when the dissolution court merges and incorporates the agreement into the divorce decree. *Id.* When interpreting these agreements, we apply the general

rules applicable to the construction of contracts. *Id.* That is, unless the terms of the contract are ambiguous, they will be given their plain and ordinary meaning. *Id.* Terms are ambiguous if a reasonable person would find them subject to more than one interpretation, but are not ambiguous merely because the parties disagree concerning their proper interpretation. *Fackler v. Powell*, 891 N.E.2d 1091, 1096 (Ind. Ct. App. 2008), *trans. denied*. Interpretation of a settlement agreement, as with any other contract, presents a question of law and is reviewed *de novo*. *Shorter v. Shorter*, 851 N.E.2d 378, 383 (Ind. Ct. App. 2006).

[21] The terms of the PSA and October 5, 2012 QDRO were agreed upon by the parties and adopted by the court in its dissolution decree. The provision related to the division of Husband's retirement savings plan is unambiguous and provides that Wife is to receive the fixed sum of $34,000 from Husband's account. Additionally, the language unambiguously states that the amount is not subject to accruals prior to the date of division. The language regarding losses is not applicable because there was not a decrease in the value of the account. Had Wife and Husband intended to share in any gains, accruals, or fluctuations which increased the value of Husband's account, they could have agreed to such terms; indeed, they did agree to share in the losses if the total value of the account decreased as of the time of distribution. *See Shorter*, 851 N.E.2d at 386 (noting that "it would have been easy enough to draft a provision utilizing language that unambiguously expressed an intention to award [the wife] an amount of cash in sum certain, as opposed to a portion of a pension

plan," that the parties did not do so, and that the agreement "evince[d] an intention to share in any fluctuations in the account during the interim period" from the valuation date and the entry of the QDRO).[5]

[22] In addition, Wife did not establish that the parties' original agreement as to the division of the marital property was subsequently modified. The PSA provided that "[n]o modification or waiver of any of the terms of this Agreement shall be valid unless in writing and executed by both parties hereto." Appellant's Appendix at 4. Wife does not point to evidence that Husband agreed to modify the parties' original agreement regarding the division of the marital property. Husband's signing of the waiver form provided by QDRO Consultants did not modify the PSA or the parties' original agreement. Husband indicated at the hearing that he did not know about the stipulation in the June 2014 Supplemental QDRO and signed the waiver form believing that Wife would receive $34,000. The trial court expressly found that Husband did not consent to modification of the PSA or knowingly waive his objection to a modification of the PSA, and we will not reweigh the evidence.

[23] Based upon the record and the parties' agreement as to the division of their marital property, we conclude that the trial court did not abuse its discretion in

---

[5] Also, the language that, "[u]nless [Wife] elects an immediate distribution that is permitted by the Plans at the time this Order is submitted to, and approved by the Plan, such benefits shall also be segregated and separately maintained in nonforfeitable accounts established on behalf of [Wife]" and that she thereafter would be entitled to self-direct the investments in her separate account, does not mean or suggest that Wife is entitled to an amount in excess of $34,000 on the date of division. That language pertains to whether Wife's share of the funds in the account, the sum of $34,000, would be distributed to her directly, if she requested an immediate distribution, or transferred into a segregated account in the retirement plan.

granting Husband's motion for relief from judgment and in ordering Wife to reimburse Husband the funds in excess of $34,000 which she and her counsel caused to be withdrawn from Husband's retirement savings account.

## II.

The next issue is whether the trial court abused its discretion in ordering Wife to pay Husband's attorney fees. She argues that the court did not give a specific reason for awarding fees and that the award was an abuse of discretion. Husband contends that the evidence shows that Wife's counsel knowingly filed "the Supplemental QDRO *ex parte* and yet, intentionally represented to the Court that the same was a stipulation of the parties." Appellee's Brief at 18. He states that, but for the misrepresentations of Wife's counsel, the trial court would not have modified the PSA and he would not have had more than $21,000 erroneously withdrawn from his retirement savings plan or needed to hire an attorney.

The trial court did not cite authority pursuant to which it awarded Husband attorney fees; however, the trial court did find that Wife acted deliberately without excuse or justification in filing the Supplemental QDRO. The record reveals that the terms of the Supplemental QDRO were different than the terms to which Husband had agreed. In particular, the parties' original agreement was that Wife would receive a fixed dollar amount and the amount would not be subject to accruals, whereas the Supplemental QDRO provided that Wife would receive half of the funds in the saving plan as of the date of the petition

for dissolution plus any interest or investment earnings. The Supplemental QDRO also stated that the parties had stipulated to its contents when that had not in fact occurred. If the Supplemental QDRO had not differed from the parties' original agreement with respect to the terms above, Husband would not have incurred attorney fees in connection with his motion for relief from judgment and the hearing on the motion. We cannot say that the trial court abused its discretion in ordering Wife to pay $1,250 in attorney fees.[6]

## III.

[26] We next address Husband's request for appellate attorney fees pursuant to Ind. Appellate Rule 66(E). Husband maintains that no facts exist to support Wife's claims on appeal and that her contentions are utterly devoid of all plausibility. Wife responds that Husband's signing of the "waiver, ratifying in a sense, the QDRO indicates that there was an agreement" and that "Wife's attorney did profess in believing that the higher award from the [S]upplemental QDRO was correct, but her attempts to rectify this situation did not amount to fraud as claimed by Husband in his Brief." Appellant's Reply Brief at 8.

[27] Appellate Rule 66(E) provides in part that this court "may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages

---

[6] *See* Ind. Code § 34-52-1-1(b), which provides that, in any civil action, the court may award attorney's fees if it finds that either party, "(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless; (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable or groundless; or (3) litigated the action in bad faith;" *see also* Ind. Code § 31-15-10-1, which allows for an award of attorney fees in dissolution of marriage matters.

shall be in the Court's discretion and may include attorneys' fees."  Our discretion to award attorney fees under Ind. Appellate Rule 66(E) is limited to instances when "an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay."  *Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003).  We must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal.  *Id.*  To prevail on a substantive bad faith claim, a party must show that the appellant's contentions and arguments are utterly devoid of all plausibility.  *Id.*  Procedural bad faith occurs when a party flagrantly disregards the form and content requirements of the rules of appellate procedure, omits and misstates relevant facts appearing in the record, and files briefs written in a manner calculated to require the maximum expenditure of time both by the opposing party and the reviewing court.  *Id.* at 346-347.  We cannot say that Wife's arguments are utterly devoid of all plausibility and decline to order Wife to pay Husband's appellate attorney fees.

## *Conclusion*

For the foregoing reasons, we affirm the trial court's order, and deny Husband's request for appellate attorney fees.

Affirmed.

Kirsch, J., and Mathias, J., concur.